**GARY SCHOER**

ATTORNEY AT LAW

NORTH SHORE ATRIUM

6800 JERICHO TURNPIKE, SUITE 108W

SYOSSET, NEW YORK 11791

---

(516) 496-3500

FAX (516) 496-3530

EMAIL: GSchoer@aol.com

June 6, 2014

<u>**VIA UPS OVERNIGHT & ECF**</u>
Honorable Joseph F. Bianco
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

RE: <u>UNITED STATES v. LEONARD I. STAMBLER</u>
    Docket No.: <u>11 CR 812 (JFB)</u>

Dear Honorable Sir:

Pursuant to the local Rules of this Court, please accept this letter on behalf of Leonard Stambler in response to, and as Objections to, the Pre-Sentence Report (PSR), as well as in support of his position relating to his impending sentence scheduled for June 20, 2014.

## FACTUAL OBJECTIONS/ADDITIONS/CLARIFICATIONS TO PART A OF THE PSR

**PSR Paragraph 7:** Dr. Stambler did not drive to patients' homes "to deliver prescriptions." The evidence at trial, including the video tape introduced, patients who testified as character witnesses as well as on behalf of the Government, and the voluminous medical records, (all reviewed by the Government but much of which were not introduced at trial), reflected that, despite not having a medical office or staff, Dr. Stambler fully

1

examined patients and prescribed to them based upon his honest belief (perhaps, at times too trustingly, naively, mistakenly or carelessly) that he was doing so for legitimate medical purposes.

It is clear, based upon all the facts known about Dr. Stambler and this case, that, unlike all of the other doctors who have been prosecuted during the most recent DEA investigation into persons distributing painkillers in the Long Island area after the Medford pharmacy murders, Dr. Stambler was not running a "pill mill", was not earning substantial sums of money and was not motivated by greed. Further, it appears that he was one of a small percentage of doctors in New York State who was using the then limited State system of prescription reporting to discover patients who were doctor shopping and that commendably, he stopped prescribing to those patients who he learned, or believed, were doing so.

Moreover, not every one of Dr. Stambler's patients was prescribed oxycodone. Rather many were prescribed other medications for their many different kinds of ailments, including Suboxone, a regulated substance that is used to treat and lessen the abuse of opioids like oxycodone.

Further, despite the implication in the PSR, it was not contrary to law, or Federal or State Regulation, to leave prescriptions on his porch, or other places, for patients, or to not fully examine them on every occasion at which Dr. Stambler prescribed medication. (See Government Exhibits 297 and 299 at trial)

**PSR Paragraph 8:** Dr. Stambler denies that he was aware that "at least" two of his patients (Adams and Cook) were re-selling the pills prescribed to them.

It is important to note with respect to this sentencing proceeding that the Government had alternative arguments and theories at trial. It argued that Dr. Stambler violated the law by writing prescriptions for oxycodone: (1) to people he knew were addicted; (2) to people he knew where sharing pills; or (3) to people he knew were selling their pills. Thus, the Government claimed that the prescriptions he wrote were not for a legitimate medical purpose.

The Government in its initial summation concluded: "To sum up, folks, even he knew his patients were addicted, crashing into buildings, selling pills, he would increase their dosage and look the other way. He drove them to many drug deals. And he knew they were transferring to others without prescriptions and

2

he wrote prescriptions for no legitimate medical purpose." (1332)[1]. In the Government's rebuttal summation counsel ended by stating:

> In terms of November 21st, the Defendant's actions are very clear, he drove Rinaldi [sic] to the pharmacy and he wrote that prescription in the name of Nancy Cook. . . .

> On November 18th, three days before, he says Adams is addicted but wants you to believe it's okay to give Adams a prescription on November 21st in Cook's name, an addict who previously forged a prescription, who previously snorted Oxycodone in front of him, who previously drove his van into a restaurant, that that [sic] is the kind of person it's legitimate to trust with someone else's prescription and counting pills. He has [sic] no right to the pills on that day.

> The Defendant admitted on November 21st that that happened right in front of him, because Nancy, Chris and Nancy [sic] sometimes [share] their pills; they take too much medication they are constantly running out of medication because they gulp it down. When asked if Adams was selling pills, he says he knows he sometimes shares his pills with other people.

> Nowhere on that day does he say Adams just told me he gave some pills to Rinaldi. . . . (1392-3)

Similarly, the Court's charge made it clear that "distribution of a controlled substance does not require a sale or exchange of money. Sharing a controlled substance is distribution so long as possession is transferred." (1424-5)

Thus, the Jury's verdict may have been based solely upon the admitted knowledge by Dr. Stambler that he was aware that Adams, Cook and Rinaldi shared their pills (1165-6, 1186, 1187, 1188), that it was illegal for them to do so (1263), and that they were doing so on November 21, 2011 (534-5) and other occasions, as well as Adams', Cook's and Rinaldi's testimony that such sharing among them was commonplace (510-2, 583, 594,

---

[1] References, for the Court's convenience are to pages of the Trial Transcript.

602, 871, 1004).[2] Moreover, the Jury may have based its determination, despite the testimony and exhibits (see e.g. Government's Exhibit 298) that the definition of addiction excludes those who may have built up a tolerance to, or physical dependency on, pain medication ("The Board also recognizes that tolerance and physical dependency may be pharmacological effects of sustained use of opioid analgesics and are not synonymous with addiction" Government Exhibit 298), on the claimed admission of Dr. Stambler that on November 21, 2011 he told Detective Hill that he believed Adams and Cook were addicted (1208) and that he was aware that prescribing to an addict who is abusing medication would be inappropriate (1214).[3] Thus, consistent with their verdict, the Jury may have disbelieved and found not credible the testimony of Adams and Cook that they informed Dr. Stambler that they were re-selling some of their pills. (cf. testimony of Rinaldi that despite conversations with Dr. Stambler that Adams was misusing or overusing the pills prescribed to him, Rinaldi never indicated to Dr. Stambler that Adams was selling pills to him or others and that he, Rinaldi, was selling any of his pills, 994-5).

Moreover, in light of the documented poor financial condition of Dr. Stambler (See PSR paragraphs 56-58) and his relatively meager life style, it seems clear that he reaped no financial benefits from the crimes for which he was convicted. In fact, it appears from all of the testimony, including that of Adams and Cook that Dr. Stambler did not charge them (637). He loaned them money not only to purchase their prescriptions, but for living expenses. He, otherwise, helped to support them, as if they were family (See 510-1, 592-3, "It seemed like a really . . . a father and son f'd up relationship. . .Lenny would do anything for Chris" 604, 636). These factors, further support the conclusion that Dr. Stambler was unaware that Adam and Cook, notwithstanding their claims otherwise, were re-selling some of their pills.

---

[2] The learning of the fact that patients are sharing/borrowing/exchanging pills presents a doctor with a Hobson's choice. The patient remains ill or in pain and in the need of treatment, but has committed the criminal act of distribution. The doctor ethically can not refuse to "heal". Trust and confidentiality issues deter reporting the distribution. Refusing to continue to treat the patient either pushes the patient to another unwitting doctor or leaves the patient without treatment.

[3] The treatment of those who have built up a tolerance to, or physical dependency on, pain medication, also presents a doctor with a Hobson's choice. If he or she cuts off the patient or tapirs down the prescription, the patient suffers. If the patient has no insurance or insufficient funds he or she cannot be referred for substance abuse treatment or cannot be placed on an expensive alternative treatment such as Suboxone. Ethically the doctor must attempt to control, to the best of his or her ability, the patient's use.

Respectfully, therefore, in light of all facts, as well as the numerous admitted lies of Adam and Cook established at trial, the defense submits that this Court, after reviewing all of the credible evidence presented at trial, should, consistent with the Jury's verdict, base its sentencing determinations herein upon the fact that Dr. Stambler was found guilty of knowingly and intentionally distributing, and conspiring to distribute, oxycodone, by, in the most part, permitting and facilitating the sharing of pills among certain of his patients and secondarily, at times, providing prescriptions to people he knew or should have known were addicts.

**PSR Paragraph 9:** Dr. Stambler's reaction to Adams forging a prescription was not as nefarious as the PSR and the Government imply. Cook testified that when Dr. Stambler learned that Adams had stolen prescriptions and forged one "he was very upset and very angry" (639) and Adams indicated:

> **Q**      Now, you testified that on June 6th you wrote two different prescriptions to yourself, correct?
> **A**      **Yes.**
>
> **Q**      And both were for Oxycodone, right?
> **A**      **Yes**
>
> **Q**      One of them he found out about (indicating), right?
> **A**      **Yes**
>
> **Q**      And after he found out about it, he confronted you, didn't he?
> **A**      **Yes**
>
> **Q**      And you promised him you wouldn't do it again, right?
> **A**      **Right.**
>
> **Q**      And you promised him – well, you asked him not to report it so that you wouldn't get in trouble, right?
> **A**      **Right.**
>
> **Q**      So that you wouldn't get arrested for forging a prescription, right?
> **A**      **Right.** (506-7)

Dr. Stambler, consistent with his personalty, his sympathetic treatment of patients and the relationship he had built up with Adams and Cook, over years, explained:

> Q    Why didn't you report the forged prescription?
>
> A    I didn't report it. Basically, I was able to get a hold of Nancy first. She didn't know about the forged prescription either. She was very upset. I mean, she was pleading with me not to do anything to Chris.
>
> And she finally had her baby. She couldn't take her baby out of the hospital for the first month. And she had a newborn the third week that she had the baby at home. And I believe at that time they were running back and forth, and always one person had to stay with her uncle. He couldn't be left alone.
>
> She needed Chris to help her care for the uncle, help her take care of the baby. And she was begging me.
>
> I finally got in touch with Chris, and I met with him. And I was screaming at him. I was ranting and raving. I know I talk too much to begin with, but I must have scolded him for 45 minutes, an hour maybe. Must have turned red in the face. I literally -- not literally - figuratively wanted to kill them.
>
> If I had gotten the stolen prescription -- the reason I asked for it, it was stolen from me. If I would have gotten it, I would have shoved it in his face and would have shoved it up his butt, pardon my language. He's begging me to please not call the police.
>
> I let him know and Nancy know if there is any sort of investigation, this prescription could be found. I did not try to cover that up. The prescription is out there. It was filled. It's a forgery, you know.
>
> So I just - and he was begging me and pleading and said, what can I do to win your trust. I'm sorry I did this. He was very apologetic.

6

> **I'm not a policeman; I'm a doctor. I have a heart. So I really -- just couldn't do it [Report the theft of the prescription and forgery and/or have Adams arrested]. I couldn't bring myself to do it.** (1294-5)

**PSR Paragraph 10:** See 8 above with respect to the credibility of discussions between Dr. Stambler and Adams regarding the re-selling of oxycodone pills. With respect to the credibility of Cook selling pills to a co-conspirator (Rinaldi) and Dr. Stambler being present with knowledge that a sale was occurring, which Dr. Stambler denies, see Rinaldi's testimony at 997-8 and Cook's testimony at 615 in which she indicates that the only times she distributed pills to Rinaldi was when she was living at 4 Morton Avenue and she left pills in the kitchen for Rinaldi.

**PSR Paragraph 12:** The evidence presented at trial is contrary to the position of the Government and of the Probation Department that Dr. Stambler made "clear his intention to provide illegal prescriptions for oxycodone to Adams and Cook" as of June 6, 2011 when he learned Adams forged a prescription, and he, thereafter, made a false entry in his medical records with respect to that forgery, See 9 above and that, therefore, all prescriptions written for these patients after that date should be considered illegal and part of the instant conviction for conspiracy to distribute. Adams and Cook continued long after June 6, 2011 to lie to Dr. Stambler to obtain prescriptions for pills, something they would not have needed to do if he was complicit in their distribution activities (see e.g. 526, 599, and 632, "We used every lie imaginable to get prescriptions from Dr. Lenny").

In addition, it is important to note that Adams on two additional occasions forged prescriptions and admittedly kept the fact of such forgeries hidden from Dr. Stambler (425,427, 443). If, as of June 6, 2011, Dr. Stambler, was issuing prescriptions to Adams and Cook without <u>any</u> legitimate medical purpose there would have been no reason for such subsequent forgeries. More importantly, the purported illegal complicity of Dr. Stambler as of June, 2011 is directly contravened by his refusal to prescribe Adams and Cook pills earlier than permitted by law, notwithstanding they were becoming sick in the wake of the tolerance they had built up (494-5). Respectfully, as set forth in 8 above, the defense submits that the Jury's verdict was based primarily upon the admitted knowledge of the sharing of pills among Adams, Cook and Rinaldi and that the relevant

7

conduct for which Dr. Stambler should be held responsible should be limited to those pills that were shared.

To, therefore, hold Dr. Stambler responsible, as the PSR does, for all prescribed pills issued to Cook and Adams after June 6, 2011 would be improper. In fact, both Adams and Cook testified that towards the "end" they were using far more pills than they were distributing (444, 531, 538, 585, 602, 630-1 [Toward the end selling was "minimal"], 632). Adams testified that at around the time of his arrest on November 21, 2011 his pain and use was "intense" (438) and he was taking "25 or 30" oxycodone pills per day (405, 444), perfectly consistent with the number of pills prescribed during the several months before his arrest. He indicated that if the amount was lessened or he ran out of pills because of overuse, notwithstanding Dr. Stambler's admonitions to cut back because of such overuse (508), he would be in severe pain and get extremely sick (438, 493). Similarly, Cook testified that she was overusing (the medical records, Government Exhibit 206-B reflecting 15-20 pills per day), despite the advice of Dr. Stambler (631), that she was in pain ["I was hurting. I was hurting yes. Yes I was hurting" (632)] and that when her pills were taken by the DEA Agents on November 21, 2011 she immediately became ill (600-1).

Under Guideline § 1B1.3 (a) (2), in determining the quantity of drugs relevant to reaching the appropriate offense level, only drugs "that were part of the same course of conduct or common scheme or plan <u>as the offense of conviction</u>" (emphasis supplied) are to be considered. Here Dr. Stambler was convicted of Conspiracy to Distribute and Distribution. Thus, any pills that were intended by him to treat the then existing pain and medical conditions of Adams and Cook and were used by them for their personal use and not for distribution purposes were not part of the "same course of conduct or common scheme or plan as the offense of conviction", See e.g. <u>United States v. Williams</u>, 247 F.3d 431 (2d Cir. 2000). As the Court in <u>United States v. Bell</u>, 667 F.3d 431 (4th Cir. 2011), a case involving oxycodone, held:

> The principal distinguishing characteristic between substances on Schedule I and those on the other Schedules is that non-Schedule I substances have at least one currently accepted medical use, and therefore can be possessed and sold legally in some circumstances. . . .
>
> That distinction potentially becomes critical in cases where a person is convicted of conspiracy

to possess with intent to distribute a controlled substance. Where there is no evidence that any of the drugs obtained by members of a conspiracy were obtained or possessed legally, all reasonable foreseeable quantities possessed by conspiracy members with intent to distribute and within the scope of the criminal activity undertaken by a particular defendant may be considered "relevant conduct" attributable to that defendant. . . .

But in a subset of non-Schedule I cases, where some or all of the drugs possessed by one or more conspiracy members were obtained and possessed pursuant to a valid prescription, that general rule potentially breaks down, because "relevant conduct" only includes "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken <u>criminal activity</u>." U.S.S.G. § 1B1.3 (a)(1)(B) (emphasis added). Where, as here, a defendant has been convicted of conspiracy to possess with intent to distribute and/or to distribute a quantum of controlled substances which she lawfully obtains and possesses, although it may be tautological to say so, only those quantities the defendant conspired or intended to possess <u>unlawfully, i.e., with intent to distribute</u>, are "relevant conduct," because a defendant is only accountable for "reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." Id. § 1B1.3 cmt. N. 2. In those cases, presuming that the full quantity possessed by conspiracy members is "contraband . . . within the scope of the criminal activity," without requiring the government to prove and without a factual finding by the district court explicating the evidence supporting that finding, creates an unacceptably high risk that a defendant will be punished for drug quantities a portion of which was lawfully obtained, possessed and consumed.

In such a case involving a valid prescription, if at sentencing the government wishes to use the total quantity prescribed to one or more conspiracy members as evidence of the quantity of "contraband . . . within the scope of the [conspiracy to possess with intent to distribute]," it must also provide evidence , and the district court must make a finding, of

something more-for example (1) that the conspiracy actually distributed a particular amount; (2) that the person who was prescribed the drug lawfully kept and consumed only a portion (or none) of the prescribed amount; (3) that the pills were obtained fraudulently and thus cannot be considered to have been lawfully obtained and possessed, see 21 U.S.C. § 843 (a) (3) (making it unlawful to "acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge"); or (4) that "each and every pill" obtained, even if pursuant to a valid prescription , was obtained "with the intent that it would or could be distributed." See, e.g., United States v. Marks, 365 F.3d 101, 106 (1st Cir. 2004). Without requiring such additional factual findings by a district court, where a defendant lawfully obtained 100 pills per month pursuant to a valid prescription and was proven to have sold or transferred just one, we encounter the risk of sustaining a finding that the sale of the one pill could render the possession of all 100 pills unlawful, by attributing an intent to distribute the remaining 99 pills without any proof whatsoever to support such a finding.

Herein, it is clear that there exists no proof that the 7,710 pills for which the PSR seeks to hold Dr. Stambler responsible for Guideline purposes were actually distributed, were not used for personal use by Adams and Cook or were obtained by them with the intent that such pills would be distributed. Even if the Jury verdict was based upon a belief that Adams and Cook were addicted and that, therefore, some of oxycodone was prescribed not for treatment of their then existing pain, there is no way to parse which pills were inappropriately prescribed.

Respectfully, therefore, for Guideline purposes, Dr. Stambler's relevant conduct in the crimes of conviction should not, and cannot, be different from that of his Co-Defendant, Adams. If pills were provided to Adams for non-legitimate medical purposes each of those pills should have been included in Adams relevant conduct Guideline calculation. Upon information and belief, the Government and the Probation Department found Adams responsible in the same conspiracy for which Dr. Stambler was convicted only for the distribution of 80 pills (20 to Rinaldi and 60 to himself) on November 21, 2011. [80 pills x 30 mg = 2400 mg or 2.4 grams x 6700 (marijuana

conversion) = 16.08 kilograms yielding a base offense level 16]. Dr. Stambler likewise should be responsible for relevant conduct yielding a base offenses level of 16.[4]

**PSR Paragraph 13:** Contrary to the PSR, Dr. Stambler did not "lie" about his actions in relation to covering up the forged prescription. He admitted he did not report the forgery to the police or the State (1223, 1253) or have Adams arrested (1176, 1223). He admitted that he made an entry in Adams' chart that Adams received a valid prescription when in fact Adams had not (1176, 1220, 1240, and 1263). Similarly, he did not clearly deny, but rather openly admitted, that he knew his patients were sharing/borrowing/exchanging their pills (1165-6, 1186, 1187, 1188, 1209, 1210, 1212-3).

"[T]o base a § 3C1.1 enhancement upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Salim, 549 F.3d 67 (2d Cir. 2008) (quoting United States v. Zagari, 111 F.3d 307 (2d Cir. 1997). "In other words, [b]efore imposing the adjustment, the district court must find that the defendant consciously act[ed] with the purpose of obstructing justice." United States v. Agudelo, 414 F.3d 345 (2d Cir. 2005) (quoting United States v. Lincecum, 220 F.3d 77 (2d Cir. 2000) (per curiam). The intent to obstruct must be unambiguous, See e.g. United States v. Kelly, 147 F.3d 172 (2d Cir. 1998). The enhancement may not be imposed if the false testimony may have been "a result of confusion, mistake, or fault memory." Agudelo, 414 F.3d at 349 (quoting United States v. Dunnigan, 507 U.S. 87 (1993). Herein, Dr. Stambler freely admitted both of the material areas to which the PSR claims he falsely testified. Respectfully, to extend the Obstruction of Justice Adjustment to the facts herein would raise the troubling prospect that future defendants might either be deterred from testifying or unfairly punished when they do. The commentary to § 3C1.1 highlights this possibility. It states, "[t]his provision is not intended to punish a defendant for the exercise of a constitutional right," and cautions that "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1 comment (n.2). See Agudelo 414 F.3d at 350. In the instant case, not only did Dr. Stambler not lie, but he, in realty, voluntarily admitted the most material of facts leading to his conviction.

---

[4] This was, in fact, the base offense level calculated for Dr. Stambler by the Government before trial. Respectfully, a Defendant should not be punished by a substantial increase in base offense level, as herein (16 to the PSR finding of 32) for exercising his right to trial.

## ADVISORY GUIDELINE OFFENSE LEVEL CALCULATIONS AND
## SENTENCING OPTIONS

**PSR Paragraph 17:** Upon the objection to paragraph 12 as set forth above, Dr. Stambler submits that the Guideline Base Offense Level should, at most, be 16.

However, the defense, further, submits that even this Base Offense Level is inappropriate in that ratios used by the Guidelines to convert oxycodone to marijuana are arbitrary and not based upon scientific, empirical evidence relating to pharmacological properties.

In drug cases, the base offense levels for Guideline calculation purposes are found in the Drug Quantity Table. U.S.S.G. § 2D1.1(c). The table sets forth base offense levels for "the more common controlled substances," U.S.S.G. § 2D1.1, comment, (n. 8(A)), including heroin, marijuana, cocaine (in both crack and powder forms), and fentanyl. However, the table does not specifically include opiate pain medications such as morphine or opioid pain medications such as oxycodone. Instead, the Guidelines use a series of conversion ratios to convert those drugs to a marijuana equivalent weight, which then determines the base offense level. For oxycodone, the Guideline conversion rate is 6700 grams (6.7 kilograms) of marijuana per one gram of oxycodone. U.S.S.G. § 2D1.1, comment(n.8)(D)). By contrast, the conversion rates for similar drugs are:

| Drug | Actual or Pill Weight | Conversion (per 1) gram) |
|---|---|---|
| Raw opium | Actual weight | 50 grams |
| Morphine | Pill weight | 500 grams |
| Codeine | Pill weight | 800 grams |
| Heroin | Actual weight | 1000 grams (1 kg) |
| Hydromorphone | Pill weight | 2500 grams (2.5 kg) |
| Fentanyl | Actual weight | 2500 grams (2.5 kg) |
| Oxymorphone (Opana) | Pill weight | 5000 grams (5 kg) |

The various ratios used to convert oxycodone and similar drugs to marijuana by the Guidelines indicate that there are some significant differences among them. However, the actual pharmacological relationships of the various drugs do not match the relationship among them created by the Guidelines. The relative dosage of different opiate and opioid drugs needed to produce the same amount of pain relief is referred to as an

"equianalgesic dose." See, Suresh K. Joishy, <u>Palliative Medicine Secrets</u>, 19 (1999); Mary Lynn McPherson, <u>Demystifying Opioid Conversion Calculations: A Guide to Effective Dosing</u>, 3-9 (2000). Pharmacists and doctors regularly reference that equianalgesic dosage when prescribing these drugs for their legitimate medical functions.

This chart ("Goodman" chart) shows the equianalgesic dose for one gram of the various drugs, along with the marijuana equivalent ratio from the Guidelines:

| Schedule I or II Drag | Amount | Marijuana Equivalency | Equianalgesic Oral Dose |
|---|---|---|---|
| 3-Methyifentanji | 1g | 10,000g | 0.003 mg |
| Fentanyl | 1g | 2,500g | 0.01 mg |
| Ajpha-medxylfenUnyi | H | 10.00 | 0.5mg |
| Dextiorooranude | 1g | 670 g | 1Jmg |
| Levoiphanol | 1g | 2,500g | 4mg |
| PEPAP | 1g | 700g | 5mg |
| Dipipanone | 1g | 250g | 6mg |
| Hydromoiphone | 1g | 2,500g | 7.5mg |
| Racemoiphan | 1g | 800g | 8mg |
| Mono a Cetyhnoxphine | 1g | 1,000 | 15mg |
| Heroin | 1* | 1,000 | 15mg |
| Etbybnojphsne | 1g | 165g | 17mg |
| Methadone | 1g | 500g | 20mg |
| Morphine | 1g | 500g | 20mg |
| Hydro eodone | 1g | 500g | 30mg |
| Oxycodone | 1g | 6,700g | 30mg |
| MPPP | 1g | 700g | 30mg |
| Alphaprodme | 1g | 100g | 120mg |
| Dextropropoxyphene | 1g | 50g | 130mg |
| Codeine | 1g | 80g | 130mg |
| Meperidine | 1g | 50g | 300mg |

Laurence L. Brunton, et al., Goodman & Gilman's <u>The Pharmacological Basis of Therapeutics, Eleventh Edition</u>, 580-581 (2005).

This chart ("McCaffery" chart) shows the different dose of several drugs, with comments on their specific workings:

| ANALGESIC | PARENTERAL (IM, SC, IV) ROUTE™ (mg) | PO ROUTE (mg) | COMMENTS |
|---|---|---|---|
| Equianalgesic Chart: Approximate equivalent doses of opioids for moderate to severe pain. | | | |
| MU UPLOAD AGONISTS MORPHINE 10 | | 30 | Standard for comparison. Multiple routes of administration. Available in immediate-release and controlled-release formulations. Active metabolite M6G can accumulate with repeated dosing in renal failure. |
| CODEINE | 130 | 200 NR | IM has unpredictable absorption and high side effect profile: used PO for mild to moderate pain; usually compounded with nonopioid (e.g., Tylenol #3). |

| | | | |
|---|---|---|---|
| FENTANYL | 100 pg/h parenterally and transdermally 3-4 mg/h morphine parenterally: 1 pg/h transdermally ≈ 2 mg/24 h morphine PO | | Short half-life, but at steady state, slow elimination from tissues can lead to a prolonged half-life (up to 12 h). Start opioid-naive patients on no more than 25pg/h transdermally. Transdermal fentanyl NR for acute pain management. Available by oral transmucosal route. |
| HYDROMORPHONE (Dilaudid) | 1.5 | 7.5 | Useful alternative to morphine. No evidence that metabolites are clinically relevant shorter duration than morphine. Available in high-potency parenteral formulation (10 mg/ml) useful for SC infusion: 3 mg rectal ≈ 650 mg aspirin PO. With repeated dosing (e.g., PCA), it is more likely that 2-3 mg parenteral hydromorphone = 10 mg parenteral morphine. |
| LEVORPHANOL (Levo-Dromoran) | 2 | 4 | Longer acting than morphine when given repeatedly. Long half-life can lead to accumulation within 2-3 days of repeated dosing. |
| MEPERIDINE | 75 | 300 NR | No longer preferred as a first-line opioid for the management of acute or chronic pain due to potential toxicity from accumulation of metabolite, normeperidine. Normeperidine has 15-20 h half-life and is not reversed by naloxone. NR in elderly or patients with impaired renal function; NR by continuous IV infusion. |
| METHADONE (Dolophine) 10 | | 20 | Longer acting than morphine when given repeatedly. Long half-life can lead to delayed toxicity from accumulation within 3-5 days. Often PO dosing on PRN schedule; in opioid-tolerant patients converted to methadone, start with 10-25% of equianalgesic dose. |
| OXYCODONE | | 20 | Used for moderate pain when combined with a nonopioid (e.g., Percocet, Tylox). Available as single entity in immediate-release and controlled-release formulations (e.g., OxyContin); can be used like PO morphine for severe pain. |
| OXYMORPHONE (Numorphan) 1 | | 10 rectal | Used for moderate to severe pain. No PO formulation. |

¹ Duration of analgesia is dose dependent; the higher the dose, usually the longer the duration. (Continued)
²IV boluses may be used to produce analgesia that lasts approximately as long as IM or SC doses. However, of all routes of administration, the highest peak concentration of the drug, and the peak concentration is associated with the highest level of toxicity, e.g., rotation. To decrease the peak effect and lower the level of toxicity IV boluses may be administered more slowly, e.g., 10 mg of morphine over 15 minute period or smaller doses may be administered more often, e.g., 5 mg of morphine every 1½ 1.5 hours. FDA = Food and Drug Administration; NR = not recommended. ≈ roughly equal to

Margo McCaffery & Chris Pasero, <u>Pain: Clinical Manual</u>, 241-243 (1999).

As these charts show, the various opioids vary in potency. For example, .01 milligram of fentanyl causes the same level of pain relief as a 30 milligram oxycodone tablet, which causes the same effect as 30 milligrams of morphine. For context, the Goodman chart shows that heroin (a Schedule I narcotic with no medical purpose) is twice as potent as morphine, oxycodone is equally potent, and fentanyl is 3000 times more potent than morphine. However, the discrepancies in the Guideline equivalencies do not reflect those differences in potency:

| Drug | Potency Compared to Morphine | Guideline Equivalency Compared to Morphine |
|---|---|---|
| Hydromorphone | 4 x | 5 x |
| Heroin | 2 x | 2 x |
| Oxycodone | 1 X | 13.4 x |
| Fentanyl | 3000 x | 5 x |

In other words, the Guidelines treat hydromorphone and fentanyl as equivalent, even though science shows that fentanyl is exponentially more potent. It similarly treats oxycodone much more severely than either morphine, which science shows is of

equal potency or heroin, a schedule I Narcotic with no medical use, which science shows is twice as potent. Therefore, the marijuana equivalency multipliers for these drugs, particularly oxycodone, appear to be completely arbitrary, irrational, and at odds with the scientific literature.[5] The Sentencing Commission has pointed to no pharmacological or other scientific evidence that justifies the wide disparity between heroin, morphine, fentanyl and oxycodone offenses under the sentencing guidelines.

Because the ratios in the Guidelines are arbitrary and unsupported by accepted pharmacology, they do not produce rationally-based offense levels, and, therefore, sentences. As such, they produce an unreliable, irrational, and unjust starting point for sentencing defendants in cases involving drugs that are not listed in the Drug Quantity Table. See, <u>Gall v. United States</u>, 552 U.S. at 49 (in sentencing "the Guidelines should be the starting point and initial benchmark"). That is not surprising, as rather than using pharmacological or other medical and scientific data to construct the Guidelines, the Sentencing Commission used "sentences provided in, and equivalencies derived from" 21 U.S.C. § 841 "as the primary basis for guideline sentences." U.S.S.G. § 2D1.1, comment, (n. 8(A)). With regard to prescription medication specifically, the Sentencing Commission admitted that due to "the statutory equivalencies, the ratios ... do not necessarily reflect dosages based on pharmacological equivalents." U.S.S.G. § 2D1.1, comment, (n. 8(B)).

As a result of the Sentencing Commission's initial decision to base the conversion ratios on statutory penalties rather than pharmacological data, the Commission was not utilizing empirical data or acting in the expert role contemplated for it by the Sentencing Reform Act. See, <u>Kimbrough v. United States</u>, 552 U.S. 85, 109 (2007) (approving a Court disregarding the Guidelines where "those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role"). Similar flaws have been repeatedly recognized by courts as a basis for disregarding the advice of the Guidelines in cases where the Guideline range is the product of an irrational process and/or policy. See, e.g., <u>United States v. Hayes</u>, 948 F.Supp.2nd 1009

---

[5]See, Gallego A. Ordonez, et al, "Oxycodone: a pharmacological and clinical review", 9 (5) <u>Clinical Transnational Oncology,</u> 298-307 (2007); DS Zhukovsky, et al, "The relative potency between high dose oxycodone and intravenous morphine: a case illustration", 18(1) <u>Journal of Pain Symptom Management</u>, 53-55 (1999); DL Saunders, et al, "Assessment of the relative potency of fentanyl buccal tablet to intravenous morphine in healthy volunteers using thermally induced hyperalgesia pain model", 52(6) <u>Journal of Clinical Pharmacology</u>, 870-879 (2012).

(N.D. Iowa 2013) (methamphetamine); United States v. Comer; 598 F.3d 411 (7th Cir. 2013) (career offender); United States v. Burks, 08-CR-187 (DLI), (E.D.N.Y. 2009), United States v. Robinson, 09-CR-564 (PGG) (S.D.N.Y. 2010), United States v. Lewis, 623 F.Supp.2d 42 (D.D.C. 2009), United States v. Gully, 619 F.Supp. 663 (N.D. Iowa 2009), United States v. Williams, 788 F.Supp.2d 847 (N.D. Iowa 2011) (crack cocaine, applying 1-to-1 ratio rather than revised statutory 18-to-1 ratio); United States v. Henderson, 649 F.3d 955 (9th Cir. 2011) (child pornography).

The irrationality of the marijuana equivalency ratios is evident when comparing Dr. Stambler's base offense level to the amount of specifically listed drugs it would take to trigger the same offense level. Assuming Dr. Stambler was responsible for distributing 80 pills [2.4 grams], the amount of marijuana (16 kilograms), heroin (15 grams), or fentanyl (6 grams) needed to trigger the same base offense level of 16 would produce many more doses, sales, and purchases by end users. U.S.S.G. §2D 1.1(c)(14). This disparity would be even more marked if the number of pills for which Dr. Stambler was responsible was as set forth in the PSR [231.3 grams of oxycodone: 1,549.71 kilograms of marijuana, 2 kilograms of heroin or 800 grams of fentanyl] Clearly, a conversion ratio more closely based on the pharmacological properties of oxycodone would produce a more rational and reasonable sentence.

Respectfully, the defense submits that more reasonable conversion ratio would be to make oxycodone equal to the same ratio as those substances with equal analgesic pharmacological properties, morphine and hydrocodone, 500 to 1. This is consistent with the treatment of heroin, a schedule I controlled substance, which is twice as potent as oxycodone and which has a conversion ratio of 1000 to 1, two times that of morphine and hydrocodone. Utilizing such a ratio, Dr. Stambler would, if responsible for 80 pills, have a Base Offense Level of 10 [80 x 30= 2.4 grams x 500= 1.2 kilograms of marijuana]; and, alternatively, even if responsible as set forth in the PSR, a Base Offense Level of 26 [231.3 grams x 500 = 115.65 kilograms of marijuana].

Notwithstanding the analysis above, the defense further urges that this Court adopt the Drug Quality Table unanimously, adopted by the Sentencing Commission expected to take effect November 1, 2014 which lowers the base offense level of all drug offenses by two levels based upon a finding that the existing table is inappropriate. Attorney General Holder has agreed that the Government will not object to such an early adoption of this revised table so long as a defendant agrees not to subsequently

seek relief pursuant to 18 U.S.C. § 3582 (c) (2). Dr. Stambler hereby waives any right to relief under 18 U.S.C. § 3582 (c) (2) and will not ask for an additional two level decrease if the proposed guideline change, as expected, becomes law on November 1, 2014.

Thus, respectfully, Dr. Stambler urges this Court to find that the appropriate Base Offense Level attributed to his conviction is 8 based upon an emperical, rational, conversion ratio; or alternatively, using the existing conversion ratio, 14, upon the quantity of pills which could appropriately be considered relevant conduct. Any other finding would require a Fatico hearing in which the Government would have to establish specifically, by a preponderance of the evidence, which of the 7,710 pills it seeks to hold him responsible for were actually distributed, were not used by Adams and Cook for personal use or were obtained by them with the intent to distribute. Finally, even if the Court, after such a hearing, were to determine that all of the pills prescribed to Adams and Cook after June 6, 2011 were relevant conduct as urged by the Government and the PSR, the Base Offense Level based upon an emperical, rational coversion ratio should be 24; or otherwise, accepting fully the calculation of the PSR and the existing conversion ratio, 30.

**PSR Paragraph 18:** Dr. Stambler believes that, nothwithstanding the Jury's verdict, which as set forth above was based in large part on his own admissions, and consistent with that verdict, he has provided a complete and truthful statement regarding his role in the instant offense and thus, is eligible for a safety valve reduction of two levels.

**PRS Paragraph 21:** Upon the objection to paragraph 13 as set forth above, Dr. Stambler submits that there should be no adjustment/enhancement, herein, for Obstruction of Justice.

**PRS Paragraph 22 and 25:** Upon all of the analysis above, the Adjusted Offense Level (Subtotal) and the Total Offense Level should be, based upon an emperical, rational, conversion ratio, 8 [Base level 8 plus 2 for adjusted role minus 2 for safety value]; or alternatively, upon the appropriate measure of attributable relevant conduct using the existing conversion ratio, 14.[6]

---

[6] Even if the quantity of pills attributable to Dr. Stambler is as found in the PSR, the Total Offense Level, based upon the new drug table and an empirical, rational, conversion ratio should be 24; or alternatively, solely upon the new drug table would be 30 (or if with the Obstruction enhancement and without the safety valve reduction 34).

**PSR Paragraph 61:** Based upon a Total Offense Level of 8 and criminal history category of I, the guideline imprisonment range is 0 to 6 months. Based upon the alternative Total Offense Level of 14 and a criminal history category of I, the guideline imprisonment range is 15 to 21 months.[7]

## FACTUAL OBJECTIONS/ADDITIONS/CLARIFICATIONS TO PART C OF THE PSR

**PSR Paragraph 37:** Dr. Stambler's wife is obviously angry and the relationship has been contentious solely because of the decrease in the amount of financial assistance (See PSR paragraph 39) he was able to provide her between his arrest/ suspension of his medical license and his conviction/ incarceration. The situation has obviously worsened since his incarceration and total lack of income.

**PSR Paragraph 38:** Notably, this incident is an isolated one and would not have been discovered absent Dr. Stambler's revealing it in the course of mental health treatment. While he was arrested he, thereafter, received an Adjournment in Contemplation of Dismissal.

**PSR Paragraph 49:** Dr. Stambler never was involved in using or abusing pain medication or any opiates or opioids. He believes that the one positive test, out of the numerous tests he gave during the almost two years he was on bail pending trial herein, must have been the result of his eating poppy seeds or was a false positive.

## NON GUIDELINE CONSIDERATIONS

While Dr. Stambler is, of course, cognizant of the Guidelines, as well as the recommendation of the Probation Department, the Supreme Court in its decisions in Gall v. United States, 552 U.S. 38 (2007) and Kimbrough v. United States, 552 U.S. 85 (2007) made it clear that extraordinary circumstances are not required to justify a sentence by a District Court outside the advisory Guideline range determined and that only "some weight" need be given to that advisory Guideline range. Thus, this Court has great discretion in fashioning a sentence

---

[7]Consistent with footnote 6, if the Total Offense Level is 24, the imprisonment range is 51 to 63 months; if 30, 97 to 121 months (and if 34, 151-188 months).

"sufficient, but not greater than necessary" pursuant to 18 U.S.C. § 3553(a).

The Second Circuit has noted that consideration of the § 3553(a) factors, unlike the Guidelines, permits a sentencing court to view each defendant independently and "make an individualized assessment of the sentence warranted by § 3553(a) based on the facts presented." United States v. Jones, 531 F.3d at 170 (internal quotations omitted). Consequently, it is also proper for sentencing courts to consider arguments that a "Guidelines sentence itself fails properly to reflect § 3553(a) considerations." Id at 172 (quoting Rita, 127 S.Ct. at 2465).

The Second Circuit has observed that assessing each defendant's individual situation "is not, after all, a precise science." Id. at 174. In United States v. Fernandez. 443 F.3d 19, 29 (2d Cir. 2006), the court similarly recognized that "[consideration of the § 3553(a) factors is not a cut-and-dried process of fact-finding and calculation; instead, a district judge must contemplate the interplay among the many facts in the record and the statutory guideposts." As a result of the various considerations that enter into a sentencing decision, there is no such thing as a so-called right answer. Indeed, the court noted in Jones:

> Rarely, if ever, do the pertinent facts dictate one and only one appropriate sentence. Rather, the facts may frequently point in different directions so that even experienced district judges may reasonably differ, not only in their findings of fact, but in the relative weight they accord competing circumstances. Such reasonable differences necessarily mean that, in the great majority of cases, a range of sentences - frequently extending well beyond the narrow ranges prescribed by the Guidelines - must be considered reasonable.

Initially, in reviewing the nature of the offense pursuant to § 3553 (a), even if this Court were not to adopt the analysis argued above concerning the non-empirical, irrational Guideline drug table with respect to oxycodone in determining the proper Guideline Base Offense Level in this case, the U.S. Supreme Court has made it clear that, in imposing a sentence pursuant to 18 U.S.C. § 3553 (a), a sentencing court has the discretion to conclude that such an arbitrary non-empirical disparate

treatment among substances may yield a "sentence 'greater than necessary' to achieve § 3553 (a)'s purposes, even in a mine-run case," Kimbrough, 552 U.S. at 109. Indeed, the Supreme Court has "clarified that district courts are entitled to reject and vary categorically from the . . . Guidelines [drug conversion ratio] based on a policy disagreement with those Guidelines, and not simply based on an individualized determination that they yield an excessive sentence in a particular case," Spears v. United States, 555 U.S. 26, (2009).See also, United States v. Diaz, 11-CR-821 (JG) in which Judge Gleeson of this Court noted that the Guideline drug table is not based upon empirical data, but rather is driven by drug type and quantity, which are poor proxies for culpability [the "weight-driven regime has resulted in a significantly more punitive sentencing grid then Congress intended . . . The Guideline ranges are not now, and have never been, the 'heartland' the Commission sought to establish."] Moreover, with respect to oxycodone which serves a valid medical purpose and is "often essential in the treatment of acute and chronic pain", it is important to insure to the public "access to appropriate and effective pain relief" and to avoid "physician fears of unwarranted legal consequences"[8] (Government Exhibit 298). Under such circumstances, public policy and safety must be carefully balanced with punishment. The Guideline treatment of oxycodone fails to do this. Respectfully, therefore, in the instant case, this Court should find that the Guideline treatment of oxycodone is both based upon a misguided and irrational policy and that it yields excessive sentences.[9] Thus, this Court should significantly factor these considerations into its § 3553(a) determination herein.

More importantly, in the instant case, pursuant to the factors to be considered as set forth in 18 U.S.C. § 3553(a), Dr. Stambler submits that, notwithstanding the serious nature of his conviction, this Court should consider, as most significant, his "history and character".

---

[8] See footnotes 2 and 3 above.

[9] Attorney General Eric Holder on April 5, 2013 at speech delivered at the 15th Annual National Action Network Convention stated as follows; "Too many people go to too many prisons for far too long for no good law enforcement reason. It is time to ask ourselves some fundamental questions about our criminal justice system. Statutes passed by legislatures that mandate sentences, irrespective of the unique facts of an individual case, too often bear no relation to the conduct at issue, breed disrespect for the system, and are ultimately counterproductive. It is time to examine our systems and determine what truly works. We need to ensure that incarceration is used to punish, to rehabilitate, and to deter and not simply to warehouse and forget." Found at http://www.justice.gov/iso/opa/ag/speeches/2013ag-speech-130404.html

Without question, Dr. Stambler is an individual who has always, prior to the instant offense, been a law abiding and productive citizen. Through hard work and determination he became a respected, caring, patient oriented, physician. As reflected in the numerous letters of support attached hereto from fellow Doctors, patients and family, he is a "hard working" "knowledgeable", "dedicated", "kind", "compassionate", "professional", "caring, concerned, involved available physician" "who spent a lot of the time with his patients and was a good listener with an unharried manner." He is a "sweet" "honest", "generous", "good man" and "friend" who went out of his way to help others and who has a big "heart". He was a good samaritan involved in community, family and religious activities and functions and always "willing to lend a helping hand." (See also the testimony at trial of the character withnesses for Dr. Stambler.)

Clearly, the actions of Dr. Stambler herein were out of character. He obviously lost his focus and let his friendship for Cook and Adams cloud his judgment. He was manipulated by them and knowing better, he became their facilitator. Respectfully, his actions and the conviction herein seem to have been consistent with, and the result of, his underlying mental health pathology as set forth in paragraph 48 of the PSR. While he could function as a physician, he was depressed, anxious, disorganized and impulsive. He was a hoarder and inclined to poor decision making. He was subject to manipulation, too trusting of others and, despite his education, very naive. He is simply "a law abiding citizen, who [did] an incredibly dumb thing" and he is "not the type of Defendant the guidelines section was designed to punish", United States v. Hadash, 408 F.3d 1080 (8th Cir. 2005). He is sixty-three years old and has significant health issues (See PSR paragraph 43) which create a substantial risk that he may have another stroke (he believes he had a small one during his current period of incarceration) and receive inadequate treatment during a lengthy period of incarceration. As a first offender, and particularly in light of the fact that he will never be able to practice medicine again, he poses no risk of recidivism, See e.g. The Sentencing Commission's report Recidivism and the "First Offender (May 2004) available at http://www.ussc.gov//publicat/Recidivism_FirstOffender.pdf; United States v. Lucania, 379 F.Supp.2d 288(E.D.N.Y.2005); Simon v. United States, 361 F.Supp.2d 35 (E.D.N.Y. 2005) and his incarceration is not necessary to protect the public, See e.g. United States v. Baker, 502 F.3d 465 (6th Cir. 2007). Clearly, a short prison sentence is just as likely to deter not only Dr. Stambler, but other Doctors similar to him, from future offending as is a long prison sentence such as recommended by

the Probation Department herein.

Notwithstanding his conviction, it is unfair to characterize Dr. Stambler, as the Government did during trial, as a "drug dealer". He took measures to attempt to insure that his patients were obeying the law. He was one of the relatively small number of doctors who then used the resources of the State to minimize doctor shopping. He refused to see prospective patients he believed were not being truthful about their medical issues and cut off seeing and treating patients he believed were acting unlawfully. He treated patients with Suboxone, a treatment alternative (See testimony at trial of George Schmitt, 1063-4 and letter of Sevan Adman attached). He was, unlike any of the other Doctors recently prosecuted in this District, not running a "pill mill"; not seeing hundreds of patients a week; not earning substanial income from his practice; and not living an exorbidant life style [contrast the fact that Dr. Stambler had no assets seized or to be forfieted as a result of his arrest and conviction with other Doctors, like Eric Jacobson who the newspapers report had $750,000.00 seized at the time of his arrest]. Moreover, unlike some of the others prosecuted, he did not provide prescriptions to minors; he did not destroy records prior to his arrest even though between the time of the car stop and Adams' arrest on November 21, 2011 and his arrest on December 1, 2001, if not earlier as the Government believes, he was aware he was being investigated; he did not continue to write prescriptions after he surrendered his license/authorization to do so; and he did not cause any of his patients to overdose. Most importantly, Dr. Stambler was not motivated in his actions herein by personal gain or greed. He does not fit the "profile of a drug dealer" and his sentence, herein, should reflect this vital distinction between him and others who have been prosecuted and convicted for distribution of controlled substances.

Moreover, as his attached letter to your Honor reflects, Dr. Stambler is extremely remorseful. Obviously, his current circumstances have surely been a learning experience which have changed him considerably. It is clear that his current situation has had a severe impact upon him and has taught him a "substantial, lasting, life lesson." He has, by the loss of that for which he worked so hard (his medical license), the loss of his ability to, in the future, do that which he lives for and most loves (help others by treating them as a physician) and his lost of his assets (his home is not now salvagable or able to be removed from foreclosure) and the source of his income, See e.g. United States v. Gaind, 829 F. Supp. 669 (S.D.N.Y. 1993), as well as by the severe impact of his conviction on his previously stellar reputation and the months of incarceration

since his being detained after trial, already been severely punished.

Clearly, under all of the circumstances of this case, including the combination of all of the above mitigating factors, see e.g. <u>United States v. Rioux</u>, 97 F.3d 648 (2d Cir. 1996), a non Guideline sentence, herein, would reflect all of the facts and circumstances relating to the instant offense and Dr. Stambler as a person, would promote respect for the law and would provide a just (sufficient but not more than necessary) punishment.

Thus, Dr. Stambler respectfully requests that, upon all of the above, this Court, considering all of the relevant sentencing issues, facts and circumstances of this case, render a sentence fairly, justly and with compassion and mercy.

Thank you in advance for your consideration of this matter.

Thank you for your consideration herein.

Respectfully submitted,

GARY SCHOER
*Attorney for Defendant*
6800 Jericho Turnpike, Suite 108W
Syosset, New York 11791
(516) 496-3500

GS/tm
cc: AUSA Allen L. Bode, Esq.
    (Via ECF)

    Jennifier G. Fisher, U.S. Probation Officer
    (Via UPS Overnight)

June 5th,
2014

Honorable Joseph F. Bianco
United States District Court
Eastern District Of New York
Central Islip, New York 11722

Dear Honorable Judge Bianco,

I am writing this letter to you to ask for leniency. I feel very sorry and
ashamed for what I have done. I realize that my judgement was clouded and I
can't really explain why. I understand the seriousness of my actions and I
accept responsibility for them.

Obviously it will never happen again. I stupidly let myself be manipulated.
I'm too trusting and naive.

I also feel that I have been punished enough. I will not ever be able to
practice medicine or pharmacy again. I am no danger to the public. Keeping
me incarcerated serves no useful purpose. I am a good person. For years i
have saved or helped many ill people. I have lost all my life's work. That
which I have enjoyed doing the most, I cannot do anymore.

I am also getting up there in age. I have many medical problems and know
that I have a decreased life span. Since my incarceration I have had a few
episodes of chest pain and one minor stroke. I am not able to get all my
medications here.

My two sons have had their education come to a halt. This really bothers

me. They have no one to mentor them to achieve what they a capable of achieving. Without my assistance they will not be able to move along the road to success. They need my help socially financially and academically. And I haven't seen them in a long time. This hurts not only me but them.

With all due respect I feel keeping me in jail serves no useful purpose. I have suffered plenty for this. There was no monetary gain on my part. I am begging you for leniency.


Sincerely,

s/

Leonard Stambler

March 14, 2014

Hon. Joseph F. Bianco
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Dear Honorable Sir,

My name is Max Stambler. I am the eldest son of Dr. Leonard Stambler. I've never had to write a letter like this in my life and I hope I will never have to do it again. The jury having decided I will stay away from the details of the case
Considering these circumstances. I will focus on My fathers Character, but specifically I will focus on the part of him that I think that I know the most well: his Heart.

My father became a Doctor to help people. He loved it. He would it always tell me how hard Medical school was and how hard working in a hospital was, but never without a smile on his face. Some people are born to heal people, and I truly believe he is one of those people. If someone was in pain or had an ailment, he felt obligated to help them. If he would be driving and came across a car accident, he would always stop. ALWAYS stop. Even if emergency medical services were already there. Just to see if there was anything he could do. He did not become a doctor to become wealthy/ He would often treat patients who did not have insurance. He would never turn patients away who sought out his help. Whenever he would take me to the hospital Doctors would always compliment him and say things like "Your dad is one of the best Doctors I have ever seen" or "You got a great dad kid" or "You have no idea how good of a doctor this guy is". Never a bad word to say about him. Not once. I loved knowing that people were proud of my Father.

He would manage to get away from the hospital and give his children time. I'll never forget catching my first fish with him. We were on vacation in the Pocono's and he brought fishing rods with him. He set the line and cast the reel and after he a few minutes he handed it to me. All of a sudden the line was tugging hard. He yelled "Bring em in!" After a few minutes I reeled him in and I was ecstatic. He was so happy. Years later I found out that he felt the fish on the line and gave it to me. it's a memory I'll never forget. We had so many good times together. One thing we really bonded over was Cub Scouts. We had a lot of special moments. I'll never forget camping and fishing during Webelos Weekend. Me and him caught so much fish (When I say me, I mean I actually did it on my own). Another great part of scouts was the Pinewood Derby. Every year we would make a car and try our best to win. We never did, but still had great fun.

During my adolescence my parents split up. Being away from his children and not watching them grow I know must have hurt him, but he always kept good spirits and always had nice things to say. By this time I got really into Wrestling. Big time. Every

Friday night after it was on we made a tradition of going to the Lynbrook Diner. It would usually be the only time he would see My brother and I each week. I know he loved taking us, and we loved going. We had so much fun. He was so good to us.

In closing the only thing I can really say is to look at his heart. I believe he is a kind and gentle man who made a mistake. I've mentioned above the memories that I have of my father. My hope is that the time for making memories with him is not over. He is, and always will be my Father. I can only hope to be as good of a man and hopefully someday as good of a father as he is.

Max Stambler

1/10/2014

<u>DEAR JUDGE BIANCO:</u>

I AM DR. STAMBLER'S ONLY BROTHER, I AM FIFTY EIGHT YEARS OLD. FOR THE LAST EIGHT YEARS I AM CURRENTLY HELPING TO RUN AN AUTO BODY SHOP.

IN HIS POOR STATE OF HEALTH, (HEART, ETC) I WOULD LIKE HIM TO BE WITH ME FOR THE REST OF HIS LIFE. DR. STAMBLER CAN ONLY DO GOOD TO SOCIETY.

IF A STRANGER ASKED HIM FOR MONEY (SAY A QUARTER) HE WOULD GIVE HIM A DOLLAR, IF SOMEBODY ASKED HIM FOR DIRECTIONS, HE OFFER TO TAKE THEM.

MOST OF ALL HIS CHILDREN NEED HIM FOR GUIDANCE.

YOURS TRULY

Carl Stambler

11 STEVENSON ROAD
HEWLETT N.Y. 11557

Ben Benatar, M.D., P.C.
Diplomate Orthopedic Surgery
David Benatar, M.D.
Diplomate Orthopedic Surgery
Spine Surgery
Bethany Sumner, PA-C
Board Certified Physician Assistant

2631 Merrick Road
Suite 303
Bellmore, NY 11710
Phone (516) 785-5350
Fax (516) 785-4530

February 12, 2014

Hon. Joseph F. Bianco
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

RE: Dr. Leonard Stambler

Dear Judge Bianco:

I have had the privilege of knowing Dr. Stambler for many years. I am an orthopedic surgeon who practices in Bellmore.

My first exposure to Dr. Stambler was as a Resident, in approximately 1991. When I was an Orthopedic Resident he worked at overlapping hospitals and I had a positive exposure to him at that time. He was a caring, concerned, involved available physician. He remained so when I got to know him at South Nassau Communities Hospital. After my residency I didn't see Dr. Stambler for a few years until I began to practice at South Nassau Communities Hospital, where he had Privileges as well. Dr. Stambler was a hard working concerned physician. He was always available for consultations. If a patient presented to the emergency room that did not have a medical physician in the hospital he would make himself available. Many physicians would not. He would come to the hospital whether it be in the afternoon, the morning or the middle of the night, evaluate the patient, stay involved with the patient throughout his or her hospital stay. He often would see the patient more than once a day. My exposure to Dr. Stambler was as a caring, concerned, involved physician.

Outside of our professional relationship we also had a doctor/patient relationship and he was an ideal patient. He was intelligent and involved in his own care and cooperative with recommendations. It was a loss to the medical community when he stopped practicing. During the course of our relationship, though we never went out socially, we did have many discussions about family and friends. He was very concerned as per his children and his wife. They are the primary concern in his life. He was very upset with any difficulty he had and he put every ounce of effort into making that as good as possible.

I am writing this letter to hopefully help Dr. Standler in his circumstances. He is, at best a good man. He cared for his family and his actions one hundred percent. He expressed his desire to the fullest time to create a loving, happy home environment and to make things as good as possible. I understand you have a very difficult decision and I hope you take this letter into your deliberations, as Dr. Standler is a caring good person and I hope you can take this into consideration with the difficult task you have.

I am writing this letter to hopefully help Dr. Stambler in his circumstances. He is, at heart, a good man. He cared for his family and his patients one hundred percent. He expressed his desire to me multiple times to create a loving, happy home environment and to make things as good as possible. I understand you have a very difficult decision and I hope you take this letter into you deliberations, as Dr. Stambler is a caring good person and I hope you can take this into consideration with the difficult task you have.

Thank you for your time and consideration.

Sincerely,

David Benatar, MD

Paul L. Schulster M.D., P.C.
Rita Schulster M.D.
442 East Waukena Avenue
Oceanside, N.Y. 11558
Telephone: 516-5999-8234    Fax: 516-678-9126

January 24, 2014

Hon. Joseph F. Bianco
United States District Judge
United States Courthouse
100 Federal Plaza
Central, New York 11722

Dear Judge Bianco,

As a Pulmonary consultant I helped care for many of Dr. Leonard Stambler's hospital patients for a number of years.  Dr. Stambler is a capable physician, well-liked by his patients and their families. During our time working together, Dr. Stambler was hard working and knowledgeable.  His diligence and caring as a physician most often led to successful medical outcomes.  I particularly remember Dr. Stambler often going to the hospital emergency room at all times of the day and night, whenever needed, taking care of his acutely ill patients.  Dr. Stambler took caring for his patients very seriously and always with compassion.  I hope my personal experience with Dr. Stambler encourages you to show him compassion.

Sincerely,

/ Rita Schulster, M.D.

RS:jvs

**Indra D. Daniels, M.D.**
**Diplomate of the American Board of Internal Medicine**
**Nephrology, Hospice and Palliative Medicine**

*1315 Broadway, Unit B, Suite 120*
*Hewlett, NY 11557*
*Ph 516 639 8415*
*Fax 516 256 6515*

January 14, 2014

Hon. Joseph F. Bianco
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, NY 11722

Dear Judge Bianco,

I am a physician, currently employed by North Shore University Hospital, and working as a hospitalist at Franklin Hospital in Valley Stream, New York.

My colleague and friend, Dr. Leonard Stambler, is a defendant in your court room, and I understand he will be sentenced before Your Honor. I would like to share my impressions of his character.

I have known Dr. Leonard Stambler for fifteen years. We met when we were both working in the Emergency Room at South Nassau Communities Hospital, and then interacted frequently as private practitioners. We remained in contact after Dr. Stambler closed his practice, and in the past year he has been a visitor to my home, and has become familiar with my husband and children.

While we worked together, I found Dr. Stambler to be a dedicated, caring physician who spent a lot of time with his patients, and was a good listener with an unhurried manner. He had a holistic approach to his patients, and strove to attend to their psychosocial needs as well as to physical complaints. I consulted on many of his patients, and found his evaluations thoughtful and thorough.

After Dr. Stambler could no longer practise medicine, he had to make tough financial decisions so that he could provide for his wife, sons and himself. He obtained a job as a taxi driver, based in my neighborhood, and worked long hours to the best of his ability.

My family and I admired his willingness to humble himself in a very different occupational setting, and his cheerful attitude. We also noted his sense of duty to his wife and children, and his concern for his brother who sustained financial losses during Hurricane Sandy.

Dr. Stambler has a generous nature and tends to give others the benefit of the doubt. I have never heard him speak ill of anyone, including those who might have wronged him. His approach is to shrug his shoulders, and take steps to move on to the next phase.

Your Honor, I hope that my observations give you some more insight into Dr. Stambler's nature, and brings his positive characteristics to your attention, so that you might exhibit as much leniency as possible when sentencing him.

Respectfully,

Indra Daniels, M.D.

Indra [illegible] Daniels, M.D.
Diplomate of the American Board of Internal Medicine
Nephrology, Hospice and Palliative Medicine

[illegible] Broadway, [illegible] Suite [illegible]
Hewlett, NY [illegible]
Tel [illegible]
Fax [illegible]

[illegible]

[illegible]

[illegible]

I have known Dr. Leonard Stambler for fifteen years. We met when we were both working in the Emergency Room at South Nassau Communities Hospital, and then interacted frequently as private practitioners. We remained in contact after Dr. Stambler closed his practice, and in the past year he has been a visitor to my home, and has become familiar with my husband and children.

While we worked together, I found Dr. Stambler to be a dedicated, caring physician who spent a lot of time with his patients, and was a good listener with an unhurried manner. He has a holistic approach to his patients, and always [illegible] as well as to physical complaints. I consulted on many of his patients, and found his evaluations [illegible] and thorough.

[illegible]

[illegible]

[illegible]

[illegible]

Respectfully,

[illegible]

Indra Daniels, M.D.

# Harvard Street Medical Associates
## Alan Markowitz, MD
## Richard Markowitz, MD
### 1553 Broadway
### Hewlett, NY 11557
### Phone: (516) 374-1677
### Fax: (516) 374-8666

Hon. Joseph F. Bianco
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, NY 11722

January 25, 2014

Dear Honorable Sir:

My name is Richard Markowitz and I am an Internist practicing in Hewlett, NY. I am writing this letter on behalf of Dr. Leonard Stambler as a character reference. I understand that he has been convicted of a terrible crime and he is due to be sentenced. I only hope that you will weigh the good work that Len has done in the past into his sentence.

Dr. Stambler and my relationship was professional. Len and I covered for each other for many years. When I would go on a vacation, I would ask Len to see my patients while they were in the hospital. As you, I'm sure, are aware, caring for people in a hospital environment is a truly noble endeavor. People are often frightened and generally not at their best, so faith in a doctor is so important to good care. Len understood this extremely well and treated my patients with dignity and respect.

While I cannot think of any specific situations, it is important to note that the vast majority of my patients appreciated Dr. Stambler's kindness, compassion and professionalism when he cared for them. I would often hear complements about Dr. Stambler when I returned. I knew that these patients would have absolutely no problem having Len care for them if the situation arose again.

# Harvard Street Medical Associates
## Alan Markowitz, MD
## Richard Markowitz, MD
*1553 Broadway*
*Hewlett, NY 11557*
*Phone: (516) 374-1677*
*Fax: (516) 374-8666*

I was certainly shocked to hear about Len's crime. I understand that upon his conviction in a Court of Law he needs to be punished. I would ask that you consider Dr. Stambler's past and hopefully show compassion. What he did was wrong but, he also saved lives. I hope that counts for something. Thank you for your time.

Sincerely,

Richard Markowitz, MD.

# SUSAN GROH M.D.

### 389 MERRICK AVE
### MERRICK, NY 11566
### 516 867-5132
### FAX: 516 867-5519

February 17, 2014

Dear Honorable Sir,

I was acquainted with Dr. Leonard Stambler as a colleague for a number of years. He was always helpful for coverage when needed. He often brought his boys with him on hospital rounds and showed his caring for his family. I am sorry for his misfortune.

Sincerely,

Dr. Susan Groh

Hon. Joseph F. Bianco
Untited States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Dear Honorable Sir,

I am writing this letter on behalf of Dr. Leonard Stambler. I have known Dr. Stambler for since roughly 2007. He was recommended to me by a friend, I have had many medical issues and have seen many doctors through the years due to a dislocated shoulder, broken knee with 3 large screws , bulged disc's in my lower back and a knee that has been for many years giving out on me since I was a child. Dr. Stambler has always been profession weather I have seen him in his office located in long beach when I first met him or in my office to help accommodate me with a crazy work schedule. I am a mortgage Banker on long island and have been since 2008 and have been self employed at one point and now currently work for JP Morgan Chase. I have seen Dr. Stambler go out of his way for many people including myself. No matter what I needed or where Dr. Stambler would meet me depending on my schedule he would never charge me more than his normal rate. He is one of the sweetest honest people I have ever met. He is very good at what he does and gave me great guidance through the years how to help with my medical issues. I feel that Dr. Stambler was a friend to me and always helped me even when it came to my personal life. I remember one time I spoke with him and told him my car was acting up and he drove me to my office on his own time and did not even take gas money. He would run for anyone he knew and I have seen that time and time again. My opinion of Dr. Stambler is that he is a great person honest and caring. He loves his family and his friends more than most people that I have met through the years. He never looked for anything in return no matter what he did for some one. I have been seeing different specialist through the years for my injuries and Dr. Stambler always gave me the best medical advice and helped me deal with my pain through different avenues. I feel that Dr. Stambler was a great asset to the community and his patience and his absence in the medical field will be felt.

Sincerely,

Steven Bertone
2784 Homan Place
Baldwin, NY 11510

MR. Albert Miller
182 mott street
Oceanside NY 11572

Dear Honorable Judge Blanco

I have known Dr. Stambler for 17 years, I met him originally as my physcian, as time went on he became my friend as well.

He is genuinely one of the most caring, good-natured compassionet and thoughtful men I know. Every time we spoke, after he said hi was how is Dennis.

Dennis is my son he is now in his late 20's, He has CP and a spastic quadrapelegic, He is totally dependant but he is very verbal.

Doctor Stambler made things alot easier for us treating Dennis in our home instead of having to transport him to the Doctors

Office. He was a blessing doing that and now it is greatly missed. My son, liked and loved him too. People that are handicapped have an inner sence of knowing what kind of person you are. I cantell you from experience there are people that he meets and knows that he does not like and will tell me so. He would also add to not leave me with that person, Such is not the case with Dr. Stambler he trusts him and loves him and misses him being his Doctor taking care of him and most of all just coming over to say hello.

Dr. Stambler has been at our house on many occasions and famely holidays

I myself hold Dr. Stambler as a upstanding citizen and a good friend, he has all the qualities one would like in a friend. He has been at my house for our yearly Passover Seders with all of my family which is upwards of 22 people. No one ever had a bad word to say about him as a matter of fact he was greatly missed at our last one and the all asked where he was.

He has shared stories with me about his family and I shared mine as well. So all I ask is please as you are sentancing this fine man remember all his fine qualities so I can get my friend back quickly Thanks so much.

Sincerly

Albert Miller

Albert Miller

March 7,2014

Dear Honorable Sir:

I am a medical secretary for 27 years .Dr Leonard Stambler is a friend and also the only doctor who helped with my pain .I was injurd in 2007 in a car accident and had surgery on my right knee. then in 2009 I broke my ankle my wrist and tore my left knee ACL..I was unable to walk without pain and could not keep my foot straight because of the medication he gave me I started walking straight because I did it without pain. Dr Stambler always did a checkup first before any medication was given to me ,he also prescribed antibiotics when I was sick.Dr Stambler is a kind trusting man who wanted to help his patients. I have know him for about 5 years now I know in my heart that Dr.Stambler would never give out medication to any one who he felt did't need it .In my opinion he trusted to much and that's why he is the position he is in now.

Sincerely,

Linda Macchio

Linda Macchio

HON. Joseph F. Bianco
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, NY 11722

Dear Judge Bianco;

My name is Beth Silverman and I am a Senior Court Clerk currently working in Jamaica NY. I have been in the Unified Court System since 1988. I am writing this letter in regards to a character reference for Leonard Stambler. I have had the privilege to know Mr. Stambler for over fifteen years. Within this time frame, I have gotten to know a wonderful man and his wonderful qualities.

Our friendship began when both of our children were in nursery school and Lenny and his family was expecting their second child. During this time period, I recently moved into the community and was immediately welcomed with open arms by them.

While getting to know Lenny and knowing he was a physician with limited available time, I was impressed that he always made it his priority to be a part of community events. He would participate in boy scouts with his children, attend family and religious functions, spend time with friends, and always willing to lend a helping hand.

Lenny has not only been a wonderful person but has also been a wonderful friend. Within the last two years, I suffered the loss of both my mother and father. During their individual sicknesses, Lenny was always helping me to understand the very confusing medical terminology. He always made sure I was clear of everything going on in order to make the best decisions for my family.

I am honored to be able to have a friend such as Lenny.

Please feel free to call me with any questions you may have.

(H) 516-867-3365
(C ) 347-750-9669

Beth Silverman

February 20, 2014

Hon. Joseph F. Bianco
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip New York 11722

Dear Honorable Sir

My name is Sevan Adman. I am the owner and operator of Competition auto repair in Island Park NY. My work is quite physical in nature, I am bent over the hood of a car day in and day out for over 25 years. As a result of constant strain I suffer from chronic lower back pain from damage to my lower spine.

The discomfort in the earlier years eventually turned to pain and progressively worsened. The doctors managed the pain with pain relievers like Tylenol which turned into Tylenol with codeine, to Vicodin and finally with ever increasing doses of Oxycodone.

I do not have much knowledge of the medical field, and I can assure you I was quite naive about prescription painkillers up until this point, and I had put myself in the hands of my doctors.

I searched for ways to correct my back and even had minor surgery which did not help for long, and I was back to the same routine.

The day finally came where I had enough, I needed a solution, I couldn't go on taking large doses of painkillers on a daily basis. I went to see a doctor that specialized in pain management. I explained to him my condition and added that I'm certain that I'm addicted to the pills. He explained that since I continue to live a normal life ( going to work, being a husband and a new father) that I wasn't addicted, just dependent on the drugs. In my opinion that's calling a Tomato a Tamato. He then prescribed me another 30 painkillers. At this point my pharmacist was even concerned at how many pills I was taking because he said they were near fatal levels.

I was introduced to Dr Leonard Stambler a few days later by a mutual acquaintance. I told him my story and that I wanted to stop taking so many pills to be able to function and that I needed a solution without major surgery. I explained to him that after a minor procedure the pain levels were much lower and within a few days after, I had stopped taking pills cold turkey. The Worst weekend of my life. I started suffering severe withdrawal symptoms, I had no idea what was going on until my wife interceded and helped me. (I told you I was naive about drugs).

Dr Stambler confirmed that I was in danger of overdosing, and explained the current epidemic with doctors over prescribing pain killers. Especially the doctor I was seeing. He regimented a drastic decrease in my consumption over a few months and carefully managed my back pain. He then prescribed a drug called Suboxone to ease the withdrawal symptoms which also includes mild pain reliever. It is a godsend, It is helping with my back pain and I haven't needed or taken a painkiller since.

I can truly say Dr Stambler saved my life. I cant believe how naive I was, And the doctors for putting my life at risk for profit, they should be held accountable. One of my friends wife just passed away from overdosing from the same issues I was having.

Dr Stambler Stands above the rest, I believe he truly cares for his patients. I don't know the facts of his case but I was shocked to hear of his conviction.

I now have Two young children whom I love dearly and I'm able to function at work and as a husband and a father without massive amounts of pills. I will always be eternally grateful to Dr Stambler for saving me from certain demise and returning my children their father.

I hope my experience with Dr Stambler sheds a little light into his humanity, and hopefully aid you in your difficult decision.

Thank You

Sevan Adman