

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

ALB

*610 Federal Plaza*
*Central Islip, New York 11722*

June 27, 2014

By Hand and ECF

The Honorable Joseph F. Bianco
United States District Judge
Eastern District of New York
924 Federal Plaza
Central Islip, New York 11722

>       Re:    United States v. Leonard I. Stambler
>              Criminal Docket No. 11-812 (S-1)(JFB)

Dear Judge Bianco:

The government writes in response to the sentencing objections raised by defendant STAMBLER by letter dated June 6, 2014. As set forth herein, the defendant's claims are without merit and/or were rejected by the jury. The jury found that STAMBLER used his trusted position as a doctor with authority to prescribe controlled substances, as part of a conspiracy to unlawfully distribute Oxycodone, a powerful and dangerous drug. STAMBLER tried to cover up his involvement and went so far as to lie in his trial testimony in an effort to obstruct justice. As such, he merits a sentence at the high end of the Guidelines here (188 to 235 months' imprisonment).

I.      GUIDELINES OBJECTIONS

        A.      Paragraph 7 of the Presentence Report

Defendant's objections to Paragraph 7 of the Presentence Report ("PSR") can be best categorized as disputing "implications" that STAMBLER reads into this introductory paragraph, rather than objecting to the facts contained in the paragraph itself. For example, STAMBLER argues that there are no regulations prohibiting a doctor from leaving prescriptions on a porch for a patient. (Def. Letter at 2). Paragraph 7 does not assert otherwise. It accurately describes what agents observed as Detective Hill testified at the suppression hearing in this case. STAMBLER's arguments were made to and rejected by the jury.

B. <u>Paragraphs 8 and 10 of the Presentence Report</u>

STAMBLER denies knowledge that his patients, Adams and Cook were reselling pills, arguing that STAMBLER should be held responsible only for "permitting or facilitating the sharing of pills among certain of his patients and secondarily, at times, providing prescriptions to people he knew or should have known were addicts." (Def. Letter at 2-5). This argument flies in the face of the jury's verdict and ignores the proof at trial.

The PSR correctly states that STAMBLER knew that pills were being resold and/or abused well prior to the day of arrest following the drug deal between Chris Adams and Anthony Rinaldi on November 21, 2011.[1] The testimony at trial established as follows:

1. <u>Adams</u>

STAMBLER's friend and "patient," Chris Adams testified that 1) following his vehicle crash into a restaurant under the influence of Oxycodone, STAMBLER gave him a new Oxycodone prescription while he was undergoing withdrawal (T 408-13), 2) he had discussed selling pills with STAMBLER and STAMBLER gave him advice as to where to sell pills (T 417, 419, 436-37), 3) following STAMBLER's discovery of the prescription forgery by Adams, STAMBLER covered up the forgery and continued to write prescriptions for more pills (T 428-29), 4) that Adams and Cook spoke about selling pills in front of STAMBLER (T 436-37), and 5) STAMBLER borrowed pills from other patients and provided them to Adams without a prescription when Adams was undergoing withdrawal (T 437-40).

2. <u>Cook</u>

Similarly, Nancy Cook testified that 1) STAMBLER knew she and Adams were selling pills, they talked about it openly in front of him and he even offered to write more pills to help them financially when they had a baby coming and did so following the baby's birth (T 584-85, 593), 2) STAMBLER covered up Adams forgery of a prescription and continued to write prescriptions for more pills (T 587-88), and 3) in the Summer of 2011, STAMBLER drove Cook to a drug deal at 4 Morton Avenue with Anthony Rinaldi, where she exchanged Oxycodone pills for cash in the passenger's seat while STAMBLER sat in the driver's seat and pretended not to see what was happening (T 589-91).

---

[1] STAMBLER apparently does not dispute the testimony at trial established that he provided Chris Adams a prescription in the name of Nancy Cook on November 4, 2011, that he saw Adams take pills for himself from this prescription and that he drove Adams to take some of these pills to Anthony Rinaldi.

2

3.  Rinaldi

Rinaldi also testified that STAMBLER drove Cook to a drug deal at the 4 Morton Avenue location where Rinaldi exchanged cash for pills at the passenger's window while STAMBLER was in the driver's seat of the vehicle pretending not to see what was going on. (T 876-78). Thereafter STAMBLER examined and provided Rinaldi with prescriptions in exchange for $100 cash per visit. (T 878-82).

4.  STAMBLER

STAMBLER's own testimony regarding his presence at the drug deal between Cook and Rinaldi was patently absurd. STAMBLER testified that he drove Cook to 4 Morton that day "to pick up some kitchen utensil" and that Rinaldi "came and shook her hand. And they hand wrestled for about ten seconds with one holding each other's hand and tugging each other. And I was watching. And I looked for a split second, and then I turned back, and they finally -- turned my back, and he handed her a white plastic bag with something in it, maybe six to eight inches, and that was about it." (T 1158-59, 1257-58).

Moreover, despite claiming a "meager lifestyle" (Def. Letter at 4), STAMBLER admitted that he told Pretrial Services at his arrest that he was making $6500 per month, almost all of which was in cash and was spending money on two patients whom he referred to as girlfriends. (T 1275-77)

In sums, STAMBLER's claim that he was "unaware" that these patients were re-selling pills (Def. Letter at 4), is belied by the evidence which the jury clearly found to be credible. STAMBLER argues that the jury may have disbelieved Cook and Adams as to STAMBLER's knowledge that they were re-selling pills, but believed them regarding his knowledge that they were sharing pills. (Def. Letter at 4). This argument is ridiculous. In any event, the Court is not constrained to gerrymander the least inculpatory implication of the testimony. The Court heard these witnesses at trial and can make its own determination as to whether they were credible.

C.  Paragraph 9 of the Presentence Report

Again, STAMBLER objects to alleged implication of this paragraph arguing that his conduct as to the forged prescription was "not as nefarious as the PSR and the Government imply." (Def. Letter at 5). He does not dispute the facts that he knew of the forgery, that he altered his medical records to include this prescription or that he responded by increasing the quantity of Oxycodone pills prescribed to Adams and Cook following the forgery.

3

Although STAMBLER cites his own testimony as well as that of Adams to establish that he was angry upon discovering the forgery, he ignores the inconvenient facts established at trial regarding the forgery. For example, pharmacist Kanti Vadsola testified that after learning of the forgery STAMBLER came to the pharmacy and attempted to replace the forged prescription (T 557-59). Nancy Cook testified that STAMBLER went to the pharmacy to take care of it, that he told Adams not to return to that pharmacy, but that although STAMBLER was upset with Adams, rather than stopping writing prescription, he wrote prescriptions for more pills. (T 557-58, 639). Chris Adams also testified that STAMBLER covered up the forgery so he would not get into trouble and continued to write him prescriptions for more pills. (T 428-29). Most significantly, STAMBLER himself admitted on cross-examination that he put the forged prescription in his medical records with the code "Rx," as if it were a prescription written by STAMBLER and that no one but he would be able to tell by the medical records that it was not a legitimate prescription. (T 1220-22). The evidence established that in fact STAMBLER increased the volume of pills he prescribed Adams and Cook and no longer examined either of them in conjunction with issuing them prescriptions. (T 1258-59; Govt Exhibits 267-270).

  D. <u>Paragraph 12 of the Presentence Report</u>

STAMBLER objects to the number of Oxycodone pills attributed to him, arguing that he should not be held responsible for all pills prescribed to Adams and Cook after the forgery cover-up. (Def. Letter at 7-11). Here STAMBLER ignores the testimony concerning the prescriptions to Adams and Cook following the forgery which show that these pills were not prescribed for legitimate medical purposes in the usual course of medical practice – rather, the prescriptions themselves were part of the illegal distribution conspiracy. It is immaterial whether the oxycodone pills were further distributed if the distribution to Adams and Cook was without a legitimate medical purpose.

As to Adams alone, STAMBLER prescribed 4,160 oxycodone pills after the forgery cover-up. (T 1252). This equates to 124.8 grams of oxycodone (836.16 kilograms marihuana equivalent) – well over the 500 kilogram marijuana equivalent threshold for Level 32 in the drug quantity table. As Dr. Waldman testified, it would not be in the usual course of medical practice to cover up such a forgery by Chris Adams and certainly would not be in the usual course to thereafter steadily increase, the number of pills he was prescribing Adams, month over month, after such a forgery. (T 792). Moreover, by the time of the forgery cover-up, Adams had already crashed his vehicle into the restaurant, and, as STAMBLER admitted, months earlier, Adams was already so dependent on oxycodone that his withdrawal led to dry heaves and he "looked like death warmed over." (T 1227, 1263-66). Nevertheless, STAMBLER increased rather than decreased Adams' dosage and following the forgery no longer even bothered to examine Adams or Cook. (T 1259, 1266).[2]

---

  [2] As STAMBLER also admitted on cross-examination, ten days after the forgery, on June 18, 2011, his own medical records indicate that Adams was "vomiting in early stages of withdrawal," and on November 18, 2011, STAMBLER wrote that Adams was "going through withdrawal" and had an "addiction problem." (T 1239). STAMBLER

4

This is entirely consistent with the testimony of Adams and Cook described above that STAMBLER <u>knew</u> they were selling pills. They have no reason to hide it by this point.

As to Cook as well, Dr. Waldman testified that Cook was clearly exhibiting obvious signs of addiction and that increasing dosages of pills was outside the usual course of medical practice. (T 796-99). Moreover, as described above, both Cook and Rinaldi described a drug deal in the Summer of 2011 where STAMBLER drove Cook to 4 Morton where she exchanged pills for cash. STAMBLER himself admitted he was present for this drug deal but claimed to have looked away during the exchange and had no knowledge of the drug deal. This testimony by STAMBLER was not credible and clearly was not credited by the jury. STAMBLER lied because he needed to explain away his presence at this drug deal. Clearly any pills prescribed to Nancy Cook after this point were outside the usual course of medicine and are properly included in the Guidelines.

The Fourth Circuit case cited by STAMBLER, <u>United States v. Bell</u>, 667 F.3d 431 (4th Cir. 2011), is easily distinguished. <u>Bell</u> does not deal with a physician illegally distributing oxycodone via prescriptions without legitimate medical purpose. <u>Id.</u> at 435. Rather, in <u>Bell</u>, the oxycodone was obtained through "valid prescriptions" and thereafter a portion of these pills were distributed. <u>Id.</u> at 443. Here, the evidence showed at trial that these prescriptions were invalid and as such, the initial distribution to Adams and Cook was itself illegal and is properly accounted for via the Guidelines.[3]

---

nevertheless continued to prescribe Adams oxycodone pills and even drove him to a drug deal. (T 1239).

[3]     STAMBLER also argues that because Adams was held responsible for only 80 oxycodone pills from November 21, 2011 (20 pills to Rinaldi and 60 to Adams), that STAMBLER should also be held responsible for the same number of pills. (Def. Letter at 10-11). STAMBLER's argument ignores the fact that the extent of this conspiracy only came to light <u>after</u> Adams had already pled guilty and been sentenced. In preparation for trial here, the government was able to interview Adams, Cook and Rinaldi and learned of STAMBLER's full involvement including covering up the forgery, driving Cook to an earlier drug deal with Rinaldi, openly discussing selling pills with his co-conspirators, etc. As is often the case, when the government prepares for trial, it uncovers more criminal activity. That is the risk a defendant takes when he demands the government prove its case. The government notes that at trial defense counsel acknowledged the government's limited pre-trial information, stating that at "the time that Adams pled guilty, he never told anybody, nor did he admit that he sold all these pills. He pled guilty. And the government based the plea agreement on 20 pills." (T 562).

5

E.   Paragraph 13 of the Presentence Report

STAMBLER clearly lied on the witness stand in an attempt to obstruct justice. The Court heard his testimony and can judge for itself, however, the jury clearly did not believe his testimony. The following is a partial list of the lies and evasion by STAMBLER:

- STAMBLER stated that on November 21, 2011, he gave the prescription in the name of Cook simply because "it was more convenient," despite the fact that he was driving Adams to the pharmacy to get the pills. (T 1165). Moreover, in 30 days prior to November 21, STAMBLER had written 5 prescriptions for a total of 830 pills for Adams –27 pills a day – between $8,000 and $16,000 worth pills, while he had written prescriptions totaling 600 pills for Cook. (Govt Exhibits 267-270).

- STAMBLER claimed that he didn't park in front of the DaVinci pharmacy because "[there] were a lot of times when . . . these was no parking spots and I would have to double-park" (T 1183) and it was his "habit" to park in the library lot next door (T 1199), when Detective Hill testified that on November 21, there was open parking in front of the pharmacy (T 217-18) and STAMBLER previously verified a prescription via his cellphone while parked behind the DaVinci pharmacy in the back of the library parking lot next door (T 1199-1200). The government submits STAMBLER was not credible in his denial that he had parked in the back because he didn't want to be seen talking on the phone when verifying a prescription at the pharmacy and thus reveal he had driven his "patient" to the pharmacy. (T 1200).

- STAMBLER's testimony regarding his interactions with DEA personnel on November 21, 2011 was clearly evasive. For example, STAMBLER testified that he had not seen Adams pour 60 pills from Cook's bottle into his own. (T 1197). However, when confronted with the fact that he had told Det. Hill on November 21 that he had seen Adams pouring the pills into his own bottle, STAMBLER stated "I saw him counting the pills. I saw him playing with the pills. I saw him putting the pills back in the vial. But I never saw two vials at once, but when we got pulled over, I was told that he had 60 pills in his own vial and basically you can't take 120 pills and pour and come out with exactly 60 in each one." (T 1204-06).

- Moreover, although Det. Hill testified that on November 21 STAMBLER left out the fact that he had driven Adams to deliver pills to Rinaldi until confronted (T 222), STAMBLER testified initially that

6

he could not recall and then stated that Adams told him after the fact that he had given pills to Rinaldi and he didn't think it was important to mention to Det. Hill. (T 1202-03).

- Although STAMBLER told Det. Hill on November 21, 2011 that he believed Adams and Cook were "addicted to oxycodone," he tried to explain this away at trial claiming that "I was using the street definition, the legal definition as applied to them is they were dependent." (T 1207-08). He further claimed that his medical records which also used the word "addiction" were also in error. (T 1216-17).

- STAMBLER denied seeking to replace the forged prescription (T 1220) despite the testimony of the pharmacist to the contrary that he came to the pharmacy and attempted to replace the forged prescription (T 557-59) and Cook's testimony that told her he went to the pharmacy to take care of it (T 557-58).

- STAMBLER claimed that he put the forged prescription in his medical records as "an indication that [Adams] did get that medicine", despite the fact that he recorded the forged prescription in his medical records with the code "Rx," as if it were a prescription he had written and that "no one else looking at these medical records would [] have any indication that [it] was a forgery. . ." (T 1220-22).

- STAMBLER wrote a letter for the court after Adams DUI arrest stating that Adams was on oxycodone (among other medications) at the time of the accident despite claiming that Adams told him he hadn't taken any oxycodone after work that day. (T 1230).

- STAMBLER's own testimony regarding his presence at the drug deal between Cook and Rinaldi was patently absurd. STAMBLER testified that he drove Cook to 4 Morton that day "to pick up some kitchen utensil" and that Rinaldi "came and shook her hand. And they hand wrestled for about ten seconds with one holding each other's hand and tugging each other. And I was watching. And I looked for a split second, and then I turned back, and they finally -- turned my back, and he handed her a white plastic bag with something in it, maybe six to eight inches, and that was about it." (T 1158-59, 1257-58).

- Although STAMBLER admitted he knew Adams was crushing and snorting oxycodone pills prior to the forgery and that Adams had even done this in front of him (T 1173, 1235), he initially claimed on cross-examination that he only "heard in court" that this was a way to get an immediate high (T 1235). When confronted, STAMBLER – a

7

pharmacist and doctor -- then admitted he had "heard that" prior to coming to court. (T 1235). He further admitted that "he didn't find it important" to write in his medical records that Adams was crushing and snorting pills. (T 1235-37).

- Perhaps most significant, STAMBLER conveniently claimed that while he did indeed drive Cook to meet Rinaldi at 4 Morton, he looked away while "they hand wrestled for about ten seconds with one holding each other's hand and tugging each other." (T 1159, 1257-58).

In sum, STAMBLER admitted his actions because he had no choice. Det. Hill saw him on Nov. 21st. The Pharmacist saw him try to get the forged prescription back. He never reported the forgery. His medical records were fake as to forgery. Cook and Rinaldi both put him as driving Cook to a drug deal. He was observed driving Adams to another drug deal with Rinaldi. STAMBLER claimed he always learned of "pill sharing" after the fact. He admitted his actions, but he denied his guilty intent.

F. Paragraph 17 of the Presentence Report

STAMBLER objects to the Guideline base level, claiming that it is inappropriate based on supposed empirical evidence and asks the Court to reject the marihuana equivalency for oxycodone as set forth in the guideline. (Def. Letter at 12-17). This claim is baseless and should be rejected by the Court.

Initially, the Government recognizes that the Court obviously has discretion pursuant to Kimbrough v. United States, 552 U.S. 85 (2007), to impose a variant sentence based on policy disagreements with the guidelines. Here, however, there is no basis for STAMBLER's claim that the base level for oxycodone is overstated. As the First Circuit has recognized in rejecting the identical argument in United States v. Landrón–Class, 696 F.3d 62 (1st Cir. 2012):

> [I]t is worth noting that the exceptionally high equivalency ratio for oxycodone is the product of a 2003 amendment to the guidelines. See Amendment 657, USSG app. C, vol. II at 397 (2003). As we explained in United States v. Ekasala, 596 F.3d 74 (1st Cir.2010) (per curiam):
>
> > Amendment 657 changed the marijuana equivalent for oxycodone in two respects. First, it based the equivalent on the amount of actual oxycodone involved rather than on the gross weight of the pills containing oxycodone. Second, it made 1 gram of oxycodone equivalent to 6,700 grams of marijuana, rather than 1 gram of pill weight equivalent to 500 grams of marijuana.

8

> Id. at 75 n. 1. Thus, unlike for many prescription drugs, when determining the guidelines range for an oxycodone-related offense, only the weight of the active ingredient (oxycodone) is used, not the full pill weight. This change was made because of proportionality issues arising when "pills containing greatly differing amounts of actual oxycodone had the same marijuana equivalent and, hence, the same base offense level." Id. at 76.
>
> In contrast, in determining the guidelines range for a morphine-related offense, the full weight of the pill or other mixture including morphine is used, regardless of potency. See USSG § 2D1.1(c) n.(A) & cmt. n.1, n.10(D). Accordingly, the apparent disparity caused by the multipliers used for oxycodone and morphine is largely neutralized by the use of a larger base weight for morphine. See United States v. Vigil, 832 F.Supp. 2d 1304, 1319, 1327–30 ( D.N.M. 2011) (discussing at length the guidelines treatment of oxycodone and finding no disparity in treatment of oxycodone and morphine).

Id. at 75-76; see also United States v. Riggs, 493 F. App'x 401, 402 (4th Cir. 2012)(rejecting challenge to marihuana-oxycodone equivalency as "the conversion rates are based on different factors and do not lend themselves to mathematical comparison.")

Similarly, in United States v. Patch, 2012 WL 2366604 (1st Cir. 2012), the First Circuit noted that:

> No court has determined that . . . the guidelines are unconstitutional" based on the marijuana/oxycodone conversion. United States v. Marte, 798 F. Supp. 2d 511, 517 (S.D.N.Y. 2011). There are sound reasons why this is so. There are "real world" considerations that make oxycodone a particularly nefarious drug, including its increasing prevalence and its tendency to lead to the abuse of even stronger drugs. United States v. Vigil, 832 F. Supp. 2d 1304, 2011 WL 6440428, at * 23-24 (D.N.M. Dec. 19, 2011) (providing comprehensive treatment of rationales for the oxycodone/marijuana equivalency contained in amendment 657).
>
> In enacting the guidelines, the Sentencing Commission considers the community's view of the gravity of the offense, the public concern generated by the offense, the deterrent effect of a particular sentence, and the current incidence rate of the offense. 28 U.S.C. § 994(c). Given the "great deal of documentation and evidence to support that oxycodone has

9

> posed significant problems in the past, and that it will continue to do so," Vigil, 2011 WL 6440428 at *24, there is a sound factual predicate for the Commission to decide that oxycodone distribution, even compared to the distribution of other similar drugs, should be punished harshly.

Id. at *11-12; see also United States v. Lewis, 521 F. App'x 109, 111 (4th Cir. 2013) (rejecting challenge to drug equivalency tables as to oxycodone and oxymorphone).

In sum, the Court should recognize that it has the authority to depart on the basis advocated by STAMBLER, but should decline to do so for the reasons stated.

    G.    Paragraph 18 of the Presentence Report

For the reasons stated above in relation to STAMBLER's attempt to obstruct justice, he clearly does not qualify for a safety valve reduction in his Guidelines exposure.

    H.    Paragraph 21 of the Presentence Report

For the reasons stated above, STAMBLER's Guidelines should be adjusted for his attempt to obstruct justice via his false testimony.

II.    STAMBLER'S REQUEST FOR A NON-GUIDELINE SENTENCE

STAMBLER's argument that he is somehow less culpable than other doctors charged with oxycodone crimes is ridiculous. Unlike any other doctor, STAMBLER involvement in the conspiracy involved him actually driving his co-conspirators to drug deals and the affirmative covering-up of a felony forgery to illegally obtain oxycodone. STAMBLER was in such a close position that he could personally see the damage done by the oxycodone he unlawfully prescribed. By his own admission he saw his co-conspirator Chris Adams so dependent on oxycodone that his withdrawal led to dry heaves and he "looked like death warmed over." (T 1263-66). STAMBLER was so close he even saw the van which Adams smashed into the restaurant under the influence of oxycodone. (T 1227-28).

STAMBLER still does not accept responsibility for his crimes. He claims that "I stupidly let myself be manipulated. I'm too trusting and naive." (Def. Letter of June 5, 2014). Although he claims that "[t]here was no monetary gain on my part," he told pretrial services at the time of his arrest that he was making $6500 cash per month (T 1276-77). Whatever his motivation, the result is still the same; he sold out his medical oath and endanger his "patients" and the public at large by unlawfully prescribing oxycodone. He did it repeatedly and intentionally. When caught he then tried to lie his way out of trouble. He still does not accept responsibility for his crimes. His request for a non-Guideline sentence should be rejected by the Court.

10

III.     CONCLUSION

        The government hereby requests that the Court sentence STAMBLER at the high end of the Guidelines here (188 to 235 months' imprisonment).

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney

By:       /s/
                              Allen L. Bode
                              Assistant U.S. Attorney
                              (631) 715-7828

cc: Gary Schoer, Esq. (via ECF)